ORDERED UNSEALED on 10/30/2024   s/ scotttwee



FILED

Oct 08 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            s/ A Cortez            DEPUTY



SEALED
s/ scottweedle

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK LARSEN (1),<br>CASK TECHNOLOGIES, LLC (2),<br><br>Defendants. | Case No. '24 CR2111 TWR<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy; Title 18, U.S.C.,<br>Sec. 201(b)(1)(A) and (C) –<br>Bribery; Title 18, U.S.C.,<br>Sec. 981(a)(1)(C) and<br>Title 28, U.S.C.,<br>Sec. 2461(c) – Criminal<br>Forfeiture |

The grand jury charges that at all relevant times:

### Introductory Allegations

**A.    Naval Information Warfare Center-Pacific/SPAWAR**

1.    The Naval Information Warfare Center-Pacific ("NIWC") was a command of the United States Navy, a branch of the United States Department of Defense ("DoD"), which was a Department of the United States Government. NIWC was headquartered in San Diego, California. Until February 13, 2019, NIWC was known as SPAWAR Systems Center-Pacific ("SPAWAR"). NIWC employed both civilian and Navy personnel. NIWC served as a research, development, test, and evaluation facility for the Navy. Among its services, NIWC provided contract administration services to various DoD commands. Those services included providing Contracting

PCS:nlv:San Diego:10/8/24

1  Officer Representatives with technological expertise to help manage DoD
2  contracts.

3      2.    NIWC had a work acceptance policy that had to be followed
4  before NIWC accepted a project. Generally work accepted at NIWC had to
5  coincide with the command's expertise and benefit the Navy. Work for
6  non-Navy commands required approval at the Executive Director level.

7  **B.    The Program Support Center at the Department of Health and**
8  **Human Services**

9      3.    The Program Support Center ("PSC") at the Department of Health
10 and Human Services ("HHS") provided acquisition services, including
11 assisted acquisition services, to various Government agencies, including
12 the DoD. In an assisted acquisition, one Government agency requested
13 assistance in the procurement process from another agency. As part of
14 the assisted acquisition process, PSC provided a Contracting Officer,
15 and assisted with determining the correct contract vehicle to use for
16 the acquisition. In carrying out its assisted acquisition services, PSC
17 frequently delegated certain responsibilities for administering and
18 monitoring its contracts to a Contracting Officer Representative
19 ("COR"). Because HHS was an outside agency, DoD would use Military
20 Interdepartmental Purchase Requests ("MIPRs") to send money for
21 contracting efforts to PSC.

22     4.    There were various documents that were typically used in the
23 Government contracting process, including the Request for Proposal
24 ("RFP"), Statement of Work ("SOW") or Performance Work Statement
25 ("PWS"), and Independent Government Cost Estimate ("IGCE"), among other
26 documents. Certain contracts required a form called the DD-254, which
27 was a form that provided certain security classification guidance to the
28 contractor.

5.    On or about June 14, 2019, PSC sent a memorandum to DoD agencies, alerting them that "[e]ffective immediately" PSC was "terminating its assisted acquisition program for non-HHS agencies."

C.    **The Small Business Administration 8(a) Program**

6.    The Small Business Administration ("SBA") 8(a) program allowed qualifying small businesses to gain access to set-aside contracts as well as sole-source contracts, in which there was no competitive bidding at all.

7.    The 8(a) program placed limitations on the largest size a business could become to participate and receive contracts reserved or set aside for small businesses. In determining the size of a business, SBA counted the business's receipts plus the receipts of its affiliates, among other measures. Businesses were affiliates of each other when one controlled or had the power to control the other, or a third party or parties controlled or had the power to control both. Businesses owned or controlled by married couples, parents, and children were presumed to be affiliated if they conducted business with each other, such as subcontracts.

8.    The 8(a) program also placed limitations on the ability of program participants receiving sole source or small business set-aside contracts under the 8(a) program to subcontract the work on the contract to other entities. Specifically, the 8(a) program participant prime contractor, or a similarly situated subcontractor, was required to perform at least 50 percent of the work on service contracts.

9.    The 8(a) program allowed qualifying small businesses to remain 8(a) certified for a maximum of nine years, after which they "graduate" from the program. The purpose of this nine year program was to assist 8(a) program participants develop and transition to competing in the

3

1  American economy with larger defense contractors and without reliance
2  on direct 8(a) awards.

3      10.    Participation in the 8(a) program was a one-time-only event
4  for businesses and individuals, with the exception of entity-owned firms
5  such as Native Hawaiian Organizations ("NHO" or "HNO"). Unlike other
6  businesses, firms owned by a NHO did not have to be in business for two
7  years to be considered for the 8(a) program. They were also able to
8  receive sole-source contracts up to 22 million dollars, well above the
9  four million dollar 8(a) competitive procurement ceiling for DoD
10  contracts.

11      **D.    The Defendants**

12      11.    Defendant MARK LARSEN ("LARSEN") was the Director, and later
13  the Managing Director, Vice President, and Executive Vice President of
14  CASK TECHNOLOGIES, LLC.

15      12.    Defendant CASK TECHNOLOGIES, LLC ("CASK") was a defense
16  contractor located in San Diego, California. CASK also had an east coast
17  office in Stafford, Virginia. CASK purported to be a women-owned small
18  business ("WOSB") and economically disadvantaged women-owned small
19  business ("EDWOSB"), but LARSEN ran CASK's day-to-day operations and
20  controlled the company.

21      **E.    Other Individuals/Entities**

22      13.    James Soriano ("Soriano") (charged elsewhere) was a civilian
23  employee of NIWC from approximately 2006 to 2019, where he worked as an
24  engineer and project lead. As part of his duties at NIWC, Soriano was a
25  certified COR.

26      14.    Dawnell Parker ("Parker") (charged elsewhere) was a civilian
27  employee of NIWC. Parker worked closely with Soriano and assisted Soriano
28  in his COR duties. In that role, Parker worked under Soriano's direction.

1  Parker claimed to be a certified COR and was designated as a COR on a
2  significant number of PSC contracts with the DoD. Unbeknownst to PSC,
3  Parker was not, in fact, a DoD certified COR, and should not have been
4  so designated.

5      15. Liberty Gutierrez ("Gutierrez") (charged elsewhere) purported
6  to work full time as a Management Analyst/Associate at CASK from
7  approximately October 2015 to September 2018. Gutierrez's job at CASK
8  entailed minimal work only a few hours a week or less. At the same time
9  that Gutierrez was purportedly working full time at CASK, she also had
10 full time jobs at Cambridge International Systems, Inc. (charged
11 elsewhere) and another defense contractor, as well as a full time job
12 at a real estate and mortgage company in San Diego, California.

13     16. Contractor-A-1 was a Government services company and wholly-
14 owned subsidiary of CASK. As part of its services, Contractor-A-1 hired
15 and staffed employees to work on Government contracts, including those
16 with CASK. LARSEN controlled Contractor-A-1 and was involved in running
17 its day-to-day operations.

18     17. Contractor-A-2 was a Government services company that LARSEN
19 helped establish in 2014. Contractor-A-2 purported to be an EDWOSB.
20 Contractor-A-2 was accepted into the 8(a) program in May 2017 and it
21 purportedly purchased Contractor-A-1 in October 2017. LARSEN controlled
22 Contractor-A-2 and was involved in running its day-to-day operations.

23     18. Contractor-A-3 was a defense contractor and wholly-owned
24 subsidiary of CASK that later separated its business line. LARSEN was
25 the Sole Member and President of Contractor-A-3.

26     19. Contractor-B-1 was a defense contractor located in Alexandria,
27 Virginia. LARSEN founded Contractor-B-1 in approximately January 2015
28 and arranged for his immediate family member who had no background or

experience in Government contracting to become its nominal 49% owner. Contractor-B-1 was accepted into the 8(a) program in September 2015 and purported to be a NHO firm.

20.   Contractor-B-2 was a defense contractor located in San Diego, California. LARSEN founded Contractor-B-2 in approximately February 2017 and arranged for his immediate family member who had no background or experience in Government contracting to become its nominal 49% owner. Contractor-B-2 was accepted into the 8(a) program in March 2018 and purported to be a NHO firm.

21.   Individual-1 was an immediate family member of LARSEN. Individual-1 claimed to own CASK, Contractor-A-1, and Contractor-A-3. Individual-1 also had a 66.6% equity stake in Contractor-A-2 following its purported purchase of Contractor-A-1 in October 2017.

22.   Individual-2 was an immediate family member of Soriano. LARSEN ensured that Individual-2 was hired in January 2017 to work as the front desk receptionist at CASK's San Diego Office. Individual-2 worked at CASK's San Diego office, and later Contractor-A-3's San Diego offices, until the end of October 2019 when her employment was terminated. CASK paid for Individual-2's salary and pay raises throughout her employment.

23.   Employee-1 worked at CASK from approximately 2012 to 2016. Employee-1 worked in business development. Employee-1 subsequently worked at another company owned by LARSEN from approximately 2016 to 2019.

24.   Employee-2 worked at CASK from approximately 2015 to 2019. Employee-2 worked in business development.

//

//

**F.** **CASK's Business Growth, "Graduation" from the 8(a) Program, and the Formation of Contractors-B-1 and B-2**

25.   In 2007, CASK became an 8(a) program participant. As an 8(a) program participant, CASK was eligible to receive set-aside contracts as well as sole-source contracts, in which there was no competitive bidding at all.

26.   From 2007 to 2015, CASK's business grew, in part due to the direct award contracts CASK received through the 8(a) program. Due to this growth, CASK would no longer qualify as a small business, as defined by the SBA, at the end of the 2016 year. CASK was set to "graduate" from the 8(a) program in September 2016. Upon graduation, CASK would no longer be eligible to receive direct award contracts through the 8(a) program.

27.   Starting in 2015, LARSEN founded several additional companies. These included Contractors-B-1 and B-2, which purported to be NHO firms. LARSEN helped prepare the 8(a) applications and their related materials for Contractors-B-1 and B-2, and ultimately these companies were accepted into the 8(a) program. As NHO firms, Contractors-B-1 and B-2 were eligible to receive 8(a) direct awards up to 22 million dollars.

28.   LARSEN founded Contractors-B-1 and B-2 and had them apply to the 8(a) program, in part, to act as vehicles for CASK to receive work on 8(a) awards after CASK was no longer eligible to receive such awards through the 8(a) program.

**G.** **CASK's "Family" of Companies and LARSEN's Control of Them**

29.   Contractors-A-1, A-2, B-1, B-2, and other companies were part of CASK's "Family" of Companies or "Preferred Partners." LARSEN or his immediate family members had an ownership interest in these companies. These companies conducted business with one another, including subcontracts on 8(a) direct awards. LARSEN also set up a sales

compensation arrangement in which CASK employees were paid a fee or commission to refer direct work to other companies in CASK's "Family" of Companies, including Contractors-B-1 and B-2. LARSEN did so expecting that some of the referred direct work, if won, would later be subcontracted to CASK.

30. During the course of the conspiracy, LARSEN controlled or exercised control of the companies in CASK's "Family" of Companies, including Contractors A-1, A-2, B-1, and B-2, or otherwise had the power to control these companies and had authority over them. LARSEN also had critical influence in the management, operations, and business of these companies. LARSEN was aware of the rules of affiliation and sought to conceal his control and authority over these companies from others.

**H.  Official Acts**

31. Soriano, as a COR, had various duties and responsibilities that were laid out in various sources including DoD Instruction ("DoDI") 5000.72, DoD Standard for Contracting Officer's Representative Certification; the DoD COR Handbook; Federal Acquisition Regulations ("FAR") 1.602, 1.604, 3.101-1, and 3.104; the Defense Federal Acquisition Regulation Supplement ("DFARS") 201.602; the Defense Federal Acquisition Regulation Supplement Procedures, Guidance, and Information ("DFARSPGI") 201.602-2, among other sources. As a COR, Soriano was supposed to be the "eyes and ears" of the Contracting Officer on the contract, and a liaison between the Government and the contractor. DFARSPGI 201.602-2; DoD COR Handbook at 1. During the pre-award phase, as the COR candidate, Soriano was supposed to work with the Government contracting team in requirements development, such as preparing the IGCE, PWS, SOW, and RFP, among other contract documents. *See* DoDI 5000.72; DFARSPGI 201.602-2; DoD COR Handbook at 40-41, 127-147. Further, during the pre-award phase, Soriano

1  was supposed to protect contractor bid or proposal information and source
2  selection information from unauthorized disclosure. *See* FAR 3.104-4.
3  During the post-award phase, as the COR, Soriano was supposed to monitor
4  and assess contractor performance and other duties as assigned by the
5  Contracting Officer. *See* FAR 1.604. As a COR, it was Soriano's
6  responsibility to protect the integrity of the acquisition process by
7  maintaining fairness in the Government's treatment of all businesses.
8  *See* FAR 3.101-1; DFARSPGI 201.602-2; DoD COR Handbook at 17-24.

9       32.  In his position at NIWC, Soriano was required to file a yearly
10  office of Government Ethics ("OGE") Form 450. During the relevant time
11  period the OGE Form 450 required that Soriano truthfully report gifts
12  totaling more than $390 from any one source during the reporting period.

13      33.  As a DoD employee, Soriano's official duties also included
14  those found in DoD Directive 5500.07-R (Joint Ethics Regulations); 5
15  C.F.R. Part 2635 (Standards of Ethical Conduct for Employees of the
16  Executive Branch); 5 C.F.R. Part 3601 (Supplemental Standards of Ethical
17  Conduct for Employees of the DoD); and Executive Order 12674 (Principles
18  of Ethical Conduct for Government Officers and Employees).

19
20

## Count 1 – Conspiracy
## (18 U.S.C. § 371)

21      34.  Paragraphs 1 through 33 of this Indictment are re-alleged and
22  incorporated herein by reference.

23      35.  Beginning in or before July 2015 and continuing through at
24  least January 2020, within the Southern District of California, and
25  elsewhere, defendants MARK LARSEN and CASK TECHNOLOGIES, LLC, knowingly
26  conspired with each other and with others known and unknown to the Grand
27  Jury to commit an offense against the United States, to wit: to, directly

28

1 and indirectly, corruptly give, offer, and promise things of value to a
2 public official, including meals, rounds of golf, jobs for Gutierrez and
3 Individual-2, and pay raises to Individual-2, with the intent to
4 influence such public official in the performance of official acts
5 and to induce such public official to do or omit to do acts in violation
6 of a lawful duty, in violation of Title 18, United States Code,
7 Section 201(b)(1)(A) and (C).

8 **MANNER AND MEANS OF THE CONSPIRACY**

9     36. In furtherance of this conspiracy, and to accomplish its
10 objects, various conspirators at various times used the following
11 manners and means, among others:

12     a. CASK through LARSEN, its employees, and others, including
13 Contractors A-1 and A-2, offered and gave a stream of benefits to
14 Soriano, including meals, jobs to Gutierrez and Individual-2, some of
15 which required minimal work, and pay raises to Individual-2. LARSEN also
16 offered and contributed to this stream of benefits by giving things of
17 value to Soriano, including rounds of golf at a private country club.

18     b. Soriano sought, accepted, and received things of value
19 from CASK, LARSEN, and others, including meals, rounds of golf, jobs for
20 Gutierrez and Individual-2, some of which required minimal work, and pay
21 raises for Individual-2.

22     c. In return for this stream of benefits from CASK and
23 LARSEN, Soriano agreed to perform official acts; to exert pressure on
24 other officials to perform official acts; and to advocate before and
25 advise other officials, knowing and intending that such advocacy and
26 advice would form the basis for their official acts; all to advance CASK
27 and LARSEN's business interests with regards to Government contracts,
28 task orders, and procurements, as questions, matters, and controversies

1  relating to those business interests were brought to Soriano's
2  attention, and as opportunities arose.

3    d. In addition, in return for this stream of benefits from
4  CASK and LARSEN, Soriano would do or omit to do acts in violation of his
5  official duties to advance CASK and LARSEN's business interests as
6  opportunities arose.

7    e. Soriano would exploit sole source contracting through the
8  8(a) program to steer Government procurements to CASK, Contractor-B-1,
9  and Contractor B-2. Soriano did so, understanding that CASK had part
10 ownership in Contractors B-1 and B-2, LARSEN appeared to be in control
11 of those companies, and those companies provided work on 8(a) awards to
12 CASK.

13   f. Soriano would exploit competitive contracting through the
14 8(a) program to steer Government procurements to CASK.

15   g. Soriano would steer or attempt to steer Government
16 procurements from one company in CASK's "Family" of Companies to another
17 when it appeared that the former company could not obtain the opportunity
18 based on its 8(a) graduation date, disadvantaged status, or other reason.

19   h. Soriano would send draft procurement documents, such as
20 the PWS and IGCE, to LARSEN and CASK employees before the procurement
21 was awarded.

22   i. Soriano would secretly allow LARSEN and others to draft
23 emails and other communications to Government agencies for him that
24 would benefit CASK.

25   j. Soriano would secretly allow LARSEN to draft official
26 Government correspondence for him that would benefit CASK and companies
27 in its "Family" of Companies or "Preferred Partners," including
28 Contractors-A-2 and B-1.

k.    Soriano would secretly allow CASK employees and others to draft documentation for Government procurements, including a competitive procurement, before they were awarded, including documents such as the PWS and IGCE. As a result, Soriano allowed CASK and others to draft the requirements for the procurement and set the price the Government expected to pay under it. For competitive procurements, this also allowed CASK to introduce specific requirements that ensured it was awarded the procurement. Further, for some sole-source procurements, LARSEN and CASK employees would draft the Justification and Approval ("J&A") document for Soriano's use.

l.    Soriano would forward internal Government email chains to CASK employees about Government procurements and funding details on such procurements to benefit CASK.

m.    Soriano would secretly allow CASK employees and others to draft Contractor Performance Assessment Reporting System ("CPARS") evaluations regarding CASK's performance on Government procurements. As a result, Soriano allowed CASK to give favorable ratings and feedback concerning its performance and effectively increased the likelihood that CASK would receive Government procurements in the future.

n.    Soriano would sit on technical evaluation panels ("TEPs") or technical evaluation boards ("TEBs"), and ensured that CASK and Contractors-B-1 and B-2 received high ratings regarding their technical ability to do the contracted work. When Parker would sit on TEPs or TEBs as a sole evaluator, Soriano would draft or assist in drafting the technical evaluations and have Parker sign them as if she completed them herself. For competitive procurements, Soriano would ensure that CASK received high ratings and its competitors received lower ratings.

//

12

o.    Parker claimed to be the COR on Government procurements for CASK and Contractors-B-1 and B-2, even though she was not a DoD certified COR. Parker signed technical evaluations of proposals to Government procurements that she did not, in fact, evaluate.

p.    After the award of a Government procurement, Soriano and Parker, as the CORs, approved invoices from CASK, Contractor-B-1, and Contractor-B-2, thereby ensuring they received payment from the Government. Soriano and Parker approved invoices from Contractors-B-1 and B-2, understanding that LARSEN appeared to be in control of these companies and these companies were providing work on 8(a) awards to CASK.

q.    CASK failed to disclose any organizational conflicts of interest due to its relationship with Soriano, its relationship with Individual-2, and its actions drafting documentation for procurement efforts it later submitted a proposal on, among other reasons, either during the procurement process or after procurement award.

r.    Soriano failed to disclose that Individual-2 was employed at CASK's San Diego office and that he understood that Contractors A-1, A-2, B-1, and B-2 were affiliated with CASK.

s.    Soriano and Parker concealed from NIWC much of their contracting activity, including their work as a COR on procurements for CASK, Contractor-B-1, and Contractor-B-2.

<u>OVERT ACTS</u>

37.    In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed in the Southern District of California and elsewhere.

//

//

13

The NECC Effort (OTA #1006-15-5-6)

A1.  On or about July 1, 2015, Soriano sent an untitled email to Employee-1, stating "3M". Attached to the email was a PWS from the Navy Expeditionary Combat Command ("NECC") for an Other Transaction Authority ("OTA") procurement effort. Employee-1 invited Soriano, Parker, and Employee-2 later that day to a meeting to discuss rapid acquisition contracting opportunities, including the NECC effort.

A2.  On or about July 2, 2015, Soriano emailed Employee-1 and an employee of another contractor, stating, "During our last meeting, Mark [Larsen] mentioned that Cask Technologies has part ownership of a Hawaiian-native company. Hopefully, [the other contractor] and CASK can team on future [Outside the Continental United States] efforts."

A3.  On or about July 3, 2015, Employee-1 emailed Soriano questions on the NECC effort, including questions on funding details to "complete the submittal package."

A4.  On or about July 6, 2015, Soriano copied Employee-1's questions, sent them to the Government customer, and falsely stated that they came from the Contracting Officer. The customer gave responses and Soriano forwarded the internal Government email chain to Employee-1. Employee-1 responded, "Perfect. Thanks. I'll put it all together and get this thing rolling."

A5.  On or about July 8, 2015, Employee-1 emailed Soriano the draft OTA procurement documents for the "NECC package" for Soriano's signature and submission. One of the documents was an unsigned letter from Soriano to the OTA's technical manager stating that the $3.1 million project was a "high priority requirement." Another document was the MIPR instructions that requested funding of the $3.1 million project by the end of the month. Soriano responded with " :) ".

14

A6.   Later, on or about July 8, 2015, Soriano emailed the "submission package" for the NECC effort to the OTA's technical manager and requested an award that month. Weeks later, Soriano followed up and clarified that the effort was "for small business – CASK Technologies."

The GSA Effort (Task Order GSQ0516BM0022)

A7.   On or about July 9, 2015, several days after Employee-1 asked if Soriano had time to discuss a procurement opportunity that would go through the General Services Administration ("GSA"), Soriano emailed a project manager at GSA requesting an "8(a)direct award to Cask Technologies." When GSA asked why CASK was qualified for the 8(a) direct award, Soriano responded by touting CASK's ability to "fully execute all tasks" based on CASK's past performance with SPAWAR. Soriano then forwarded the internal Government email chain to Employee-1.

A8.   A few weeks later, on or about July 28, 2015, Soriano asked Employee-1 whether CASK could give a job to Gutierrez, his close family friend.

A9.   On or about July 31, 2015, Employee-1 messaged CASK's Office Manager, stating, "[I] can[']t have lunch today[.]  [I]'m meeting [J]im at noon and the girl he wants us to hire ... $3.1M."

A10. Later, on or about July 31, 2015, Employee-1, Soriano, and Gutierrez met to discuss a job for Gutierrez at CASK. After the meeting, Gutierrez emailed Employee-1, stating, "Please be advised that I was getting $87,000/year at [another contractor] and 10-15% increase would be very much appreciated. I'm looking forward to working with CASK and I hope contract gets awarded soon." Later that day, LARSEN messaged another CASK employee, asking, "Do you know the name of the gal we're hiring for Jim?" The employee replied, "Liberty Gutierrez."

//

A11. On or about August 13, 2015, CASK, through LARSEN, offered Gutierrez a job as a "Management Analyst/Associate" earning $95,000 a year. This job offer was contingent on the $3.1 million OTA for the NECC effort being awarded to CASK.

A12. On or about August 14, 2015, Gutierrez accepted CASK's contingent job offer. The next month, as a result of the technical evaluation of CASK's proposal to the OTA solicitation, which Soriano was involved in evaluating, CASK was awarded OTA 1006-15-5-6 for the NECC effort. This award had a total potential value of $2,975,966 and a 12 month period of performance. As promised, CASK hired Gutierrez as a "Management Analyst/Associate," earning $95,000 a year, and billed out her time to OTA 1006-15-5-6.

A13. On or about September 2, 2015, in response to GSA's price quote request for an 8(a) direct award, Soriano allowed LARSEN and another individual to "ghost write" his responses to LARSEN's questions seeking clarification to the solicitation. Soriano did so, knowing that the responses were meant to benefit CASK. To conceal the "ghost write" from GSA, Soriano asked LARSEN and the other individual to send the responses to his personal email account. Soriano copied the responses, sent them to GSA from his SPAWAR email account, and falsely claimed to have received the responses from the program manager.

A14. On or about September 11, 2015, Soriano prepared a technical evaluation of CASK's proposal to GSA Solicitation ID05150125. Soriano was the sole evaluator and gave a favorable technical rating to CASK. Soriano later prepared a revised evaluation that also gave a favorable technical evaluating to CASK. Several months later, as a result of Soriano's favorable rating, CASK was awarded GSA STARS II 8(a) Direct Award GSQ0516BM0022 for the GSA effort. This award had a total potential

16

1    value of $3,862,790.80 and it was a 12 month task order with three option

2    years.

3         A15. On or about November 4, 2015, Employee-1 took Soriano and

4    others to dinner at Fogo de Chão Brazilian Steakhouse in San Diego,

5    California. Employee-1 paid $262.43 for the meal and expensed it to CASK

6    as a "Business Meeting."

7         A16. On or about November 13, 2015, Soriano attended a CASK

8    "team building" event for San Diego-based employees at Pechanga Arena

9    in San Diego, California to watch a San Diego Gulls hockey game. LARSEN

10   paid approximately $3,235.30 for the event, including $604.80 for

11   catering from Old Town Rockin Baja in San Diego, California, and expensed

12   it to CASK.

13        A17. On or about January 22, 2016, LARSEN took Soriano and

14   others to dinner at Fogo de Chão Brazilian Steakhouse in downtown San

15   Diego, California. LARSEN paid $1,593.52 for the meal and expensed it

16   to CASK as a "Team Dinner."

17      The NCTS-SD Effort (HHS Contract 116A)

18        A18. On or about February 3, 2016, Soriano sent Employee-1 a

19   PWS from the Naval Computer and Telecommunications Station, San Diego

20   ("NCTS-SD") for a procurement effort, stating, "Streamline 8a to

21   Cask..." This was a services contract set to be awarded by the end of

22   the 2016 fiscal year.

23        A19. On or about March 23, 2016, Soriano played in a LGPA Pro-

24   Am golf tournament with LARSEN and others at Aviara Golf Club in

25   Carlsbad, California. After the golf tournament, LARSEN took Soriano and

26   others to dinner at West Steak Seafood in Carlsbad, California. LARSEN

27   paid $680.97 for the meal and expensed it to CASK as a "Business Meal[]."

28   //

A20. On or about August 7, 2016, Soriano emailed Employee-1 the PWS and IGCE for the NCTS-SD effort and asked the employee to "adjust" the documents before he sent them to NCTS-SD for funding. In response, Employee-1 asked if they can add "contracts management support" hours in the IGCE to cover Gutierrez, as her work on OTA 1006-15-5-6 was coming to an end in September 2016. Soriano replied, "Add Libby's hours on all tasks......"

A21. Later, on or about August 7, 2016, Soriano emailed PSC the PWS for the NCTS-SD effort and advised PSC that the effort would be a direct award to Contractor-B-1. Soriano added, "Cask was identified, but the company will graduate from the 8(a) program."

A22. On or about August 8, 2016, Employee-1 emailed Soriano a revised IGCE for the NCTS-SD effort. Employee-1 stated that he had made "considerable adjustments" to the IGCE, such as adding 640 hours for Gutierrez as a "Sr. Contracts Management Admin." The employee added, "I also spoke to Mark [Larsen] regarding our 8(a) graduation – as long as Cask receives the solicitation before 9/6/2016 we can still be awarded the 8(a) direct. Otherwise we can use STARS II or [Contractor-B-1]. But using Cask always makes things easier." Several days later, Employee-1 forwarded the PWS, IGCE, and revised IGCE for the NCTS-SD effort to LARSEN.

A23. On or about August 11, 2016, CASK's Officer Manager paid for flowers to be sent to Soriano on behalf of the "Cask Family," totaling $84.22, while Soriano was in the hospital for a surgical procedure. When informed of the purchase, a CASK employee who was proposed to work on the NCTS-SD effort stated, "Good deal. Cask knows who butters our bread."

//

18

A24. On or about August 23, 2016, due to Soriano's surgical procedure, Parker emailed PSC the PWS, IGCE, and MIPR instructions for the NCTS-SD effort, stating, "[T]his is a streamlined 8a to Cask if they get the solicitation before September 9th otherwise it will go to [Contractor-B-1]." While Soriano remained the COR in the PWS, the IGCE did not contain hours for a "Sr. Contracts Management Admin." A week later, as requested, PSC sent CASK the solicitation for the NCTS-SD effort.

A25. On or about September 7, 2016, Parker submitted to PSC a technical evaluation of CASK's proposal for the NCTS-SD effort. Parker was the sole evaluator and rated CASK's overall technical approach "Acceptable."

A26. On or about September 9, 2016, LARSEN asked CASK's Associate Director, "Are we moving Libby to another contract?" and added, "I was under the impression that Jim had put money on the other contract for her." When LARSEN was informed that CASK did not have another contract to move Gutierrez to, LARSEN told CASK's Associate Director that Gutierrez would be told at the end of the month that she was no longer employed at CASK. LARSEN added, "She['s] Jim['s] girl – so we need to be a little sensitive[,]" but that "she needs to know we['] re waiting for Jim['s] other contracts to come through" and "[w]e want her to go apply pressure to Jim ...."

A27. On or about September 19, 2016, after being notified that CASK submitted a contract type in its proposal that differed from the contract type in the solicitation for the NCTS-SD effort, Parker emailed PSC that she did not object to a change in contract type. A PSC employee informed Soriano and Parker that he will have the contract prepared the following day and submitted for review and approval.

19

A28. On or about September 21, 2016, despite Gutierrez not having a contract to work on, CASK made the decision to retain her as an employee and pay her from overhead. According to CASK's Director, retaining Gutierrez as an employee was "a price of doing business with an advocate of CASK."

A29. On or about September 22, 2016, as a result of Parker's favorable technical evaluation and approval of the change in contract type, PSC awarded CASK 8(a) Direct Award HHSP233201650116A for the NCTS-SD effort. This award had a total potential value of $1,930,184.86.

A30. Five days later, on or about September 27, 2016, LARSEN took Soriano and others to dinner at Seasons 52 in San Diego, California. LARSEN paid $524.74 for the meal and expensed it to CASK as a "Business Meal[]."

A31. On or about November 23, 2016, Soriano asked Employee-1 for help finding Individual-2 a job. LARSEN was later informed of Soriano's job request for Individual-2.

The December 15, 2016 Meeting

A32. On or about December 15, 2016, Soriano had a meeting with Employee-2 and Parker, among others, where they agreed that Soriano and Parker will "create & award a 3.85M GSA 8a STARS II Direct Award contract for Services to Cask," to be awarded no later than January 20, 2017; "create & award a 22M HNO Direct Award contract for Services to [Contractor-B-1]," to be awarded no later than February 3, 2017; and "create & award a 50M Competitive Award contract for Services to Cask," to be awarded no later than April 30, 2017.

A33. On or about December 16, 2016, Employee-2 drafted an email summarizing the meeting above and sent the email to Soriano, LARSEN, and others. In the email, Employee-2 stated that he was going

1  to draft the PWS and IGCE for the "22M HNO Direct Award" to Contractor-
2  B-1 and the "50M Competitive Award" to CASK. Employee-2 added that the
3  "3.85M GSA STARS II Direct Award" was to be initiated by Parker
4  "utilizing existing SPAWAR documents."

5          A34. On or about December 21, 2016, CASK, through LARSEN, gave
6  Gutierrez a $1,900 raise in salary and $500 bonus, despite Gutierrez
7  being paid on overhead for the previous three months. In proposing the
8  $1,900 raise to LARSEN, CASK's Director stated that he figured it would
9  "keep Jim happy."

10         A35. Also, on or about December 21, 2016, LARSEN emailed the
11 President of Contractor-A-1, stating, "Going to probably hire a new
12 receptionist for the SD Office the first week of January.... You should
13 be receiving an application... from [Individual-2]. When you do – can
14 you forward it to me?" Later that day, Individual-2 submitted a job
15 application to Contractor-A-1 for CASK's front desk receptionist
16 position. As requested, the President of Contractor-A-1 forwarded
17 Individual-2's job application to LARSEN.

18     The 50M Competitive Award (HHS Task Order 24W)

19         A36. On or about December 22, 2016, Parker emailed PSC the PWS
20 and IGCE for the approximate $50 million 8(a) competitive award contract
21 for services that Soriano previously agreed would be awarded to CASK.
22 Soriano was listed as the COR in the PWS, and document properties reflect
23 that the IGCE was drafted by Employee-2.

24         A37. On or about December 23, 2016, LARSEN emailed the
25 President of Contractor-A-1 that Individual-2 was "probably a hire the
26 first or second week of January" and proposed Individual-2's salary.
27 Later that day, CASK employees interviewed Individual-2 for the front
28 desk receptionist position at CASK.

A38. On or about January 3, 2017, at LARSEN's direction, Contractor-A-1 extended a job offer to Individual-2 for $40,000 a year to work as the front desk receptionist at CASK's San Diego office. Individual-2 accepted the job offer and started work at CASK's San Diego office the next day.

The 3.85M GSA Stars II Direct Award (HHS Contract 79G)

A39. On or about January 10, 2017, Parker emailed PSC the PWS and IGCE for the $3.85 million GSA STARS II 8(a) direct award contract for services that Soriano previously agreed would be awarded to CASK. Parker stated in her email to PSC, "This will be a onetime award to CASK[,] an EDWOSB[,]" and added, "[t]he sooner we can get this on[e] in place the better."

A40. On or about February 17, 2017, Soriano forwarded LARSEN a SPAWAR letterhead. Soriano did so to allow LARSEN to draft a CASK reference letter on SPAWAR letterhead. Soriano signed the "Letter of Appreciation" drafted by LARSEN, which was a glowing commendation of CASK. The letter was backdated to February 3, 2017 and sent to LARSEN to submit to the SBA for CASK and Contractor-B-1's 8(a) mentor-protégé application.

A41. On or about February 24, 2017, Parker submitted to PSC a technical evaluation of CASK's proposal for $3.85 million Army PEO AV C4I effort. Parker was the sole evaluator and rated CASK's overall technical approach "Excellent" and gave CASK an overall technical rating of "Excellent." Parker also emailed PSC that CASK's cost proposal was "acceptable" and stated, "We really need to get this awarded next week...." As a result of this evaluation and advocacy, on or about March 6, 2017, PSC awarded CASK GSA STARS II 8(a) Direct Award HHSP233201700079G. This award had a total potential value of

$3,947,745.49. To conceal Soriano's involvement, Parker was listed as the COR in the task order.

### The 22M HNO 8(a) Direct Award (HHS Contract 11I)

A42. On or about March 5, 2017, Parker emailed PSC the PWS, IGCE, and RFP for the $22 million HNO 8(a) direct award contract for services that Soriano previously agreed would be awarded to Contractor-B-1. Parker stated in the email to PSC, "This is to start a new direct award to [Contractor-B-1] for [Army] PEO AV."

A43. On or about March 7, 2017, Parker submitted to PSC a technical evaluation of Contractor B-1's proposal to the $22 million HNO 8(a) direct award. Parker was the sole evaluator and rated Contractor-B-1's overall technical approach "Very Good" and gave Contractor-B-1 an overall technical rating of "Very Good." Parker also emailed PSC that Contractor-B-1's cost proposal was "acceptable" and the MIPR submitted the week prior would be the first task order against the contract. As a result of this evaluation, on or about April 12, 2017, PSC awarded Contractor-B-1 NHO 8(a) Direct Award HHSP233201700011I ("HHS Contract 11I"). This award had a total potential value of $19,917,927. It was a three year indefinite delivery, indefinite quantity ("IDIQ") contract vehicle and task orders could be placed against it. To conceal Soriano's involvement, Parker was listed as the COR in the contract.

A44. On or about March 23, 2017, Soriano allowed LARSEN to draft a sponsor letter for Contractor-A-2 on SPAWAR letterhead for Soriano's signature. Soriano did so to allow LARSEN to submit the letter in Contractor-A-2's application to access Microsoft Azure Government Cloud. The letter claimed that Contractor-A-2 had been involved with SPAWAR for "multiple years" and "regularly" processed, handled, and

controlled U.S. Government controlled data. Soriano signed the letter drafted by LARSEN and LARSEN provided it to Microsoft.

A45. On or about April 5, 2017, three months after starting work at CASK, at CASK's direction, Contractor-A-1 increased Individual-2's salary to $50,000 and promoted Individual-2 to the position of "Financial Analyst." Despite the $10,000 pay raise and promotion, Individual-2 maintained the duties and responsibilities she had as CASK's front desk receptionist.

A46. On or about May 25, 2017, Parker emailed PSC a revised PWS for the approximate $50 million 8(a) competitive award contract for services that Soriano previously agreed would be awarded to CASK. The revised PWS included a new requirement that the winning contractor be "a ServiceNow Partner at the Gold level or above." Soriano remained the COR in the revised PWS.

A47. On or about August 2, 2017, Soriano emailed Employee-1, copying LARSEN, and asked if he should send a $1.2 million task order to CASK through GSA STARS II. Employee-1 responded, copying LARSEN, "It should be a direct award to [Contractor-B-1]. They will exceed the $4m ceiling on traditional 8(a) awards, so we need to use the Hawaiian designation. The total value will be about $20m. The $1.2m is just the start to get the contract going." The next day Soriano replied, "Understand.... I will relay to the [Contracting Officer]..."

### Contractor-B-1 Subcontracted Work to CASK (HHS Contract 11I)

A48. In or around September 2017, pursuant to a subcontract agreement between CASK and Contractor-B-1 for CASK to "perform certain 'Services' for [Contractor-B-1]" on HHS Contract 11I, Contractor-B-1 issued work orders for CASK to work on 10+ task orders placed against HHS Contract 11I. HHS awarded the task orders, without competition, to

24

Contractor-B-1, and their total potential value exceeded approximately $8.9 million. Both Soriano and Parker approved invoices on the task orders.

A49. On or about December 27, 2017, Soriano led the TEP for the approximate $50 million 8(a) competitive award contract for services that Soriano previously agreed would be awarded to CASK. In response to CASK's proposal to RFP #17-233-SOL-00693, Soriano rated CASK "Excellent" in each category and gave CASK an overall technical rating of "Excellent." For the two contractors that submitted competing proposals, Soriano rated them "Poor" or "Neutral" in each category and gave them an overall technical rating of "Poor." Soriano based his ratings, in part, on the PWS requirement that the contractor be a "ServiceNow Partner at the Gold Level or above." As a result of Soriano's evaluations, on or about December 29, 2017, PSC awarded CASK 8(a) Competitive Award HHSP233201800024W ("Task Order 24W"). This award had a total potential value of $47,780,035.80. Soriano was listed as the COR on Task Order 24W.

A50. After the issuance of Task Order 24W, starting on or about December 29, 2017, CASK did not report any organizational conflicts of interest to the Contracting Officer pertaining to Task Order 24W and its initial funded amount of $1,281,704.38. Task Order 24W and the initial funded amount contained a provision in the procurement titled "Post Award Organizational Conflicts of Interest" which required CASK to report all actual or potential conflicts of interest pertaining to Task Order 24W and the initial funded amount to the Contracting Officer.

A51. On or about January 7, 2018, Soriano submitted a signed "Confidentiality Agreement and Conflict of Interest Statement" for RFP #17-233-SOL-00693. Soriano falsely certified in that statement that

neither he nor any members of his family had a direct or indirect interest in any of the firms that submitted a proposal on the contract that conflicted substantially, or appeared to conflict substantially, with his duties as a member of the TEP.

A52. On or about January 28, 2018, after one of the contractors that submitted a competing bid on RFP #17-233-SOL-00693 filed a protest against the award decision of Task Order 24W, Employee-2 drafted responses to the protest allegations and emailed them to LARSEN and others to review. In response to the allegation that "Jim Soriano ha[d] an apparent close relationship with Mark Larsen of Cask LLC," the response merely stated: "Cask has a contractual support services relationship with the Navy and SPAWAR. Cask has XX contracts with Navy and SPAWAR. Mr[.] Soriano has been affiliated with 3 contracts serving as the COR on those contracts." The response did not disclose further details about the relationship between Soriano and LARSEN, such as the jobs given to Gutierrez and Individual-2, Individual-2's $10,000 pay raise, and the December 15, 2016 meeting, in which Soriano agreed to "create & award" the approximate $50 million 8(a) "competitive" award to CASK. Neither LARSEN nor CASK disclosed these details to PSC in its consideration of the protest against the award decision of Task Order 24W.

### Attempted Re-Compete of the 50M Competitive Award

A53. On or about March 5, 2018, the same day that PSC denied the protest against the award decision of Task Order 24W and canceled Task Order 24W for various reasons, Parker emailed PSC a PWS and IGCE to start a "NEW" $50 million 8(a) competitive award for services to support Army PEO AV. The PWS and IGCE for this "NEW" $50 million competitive award concerned the same or similar requirement of the

1  protested and canceled Task Order 24W that Soriano previously agreed
2  would be awarded to CASK. The PWS for the "NEW" award had Parker listed
3  as the COR.

4       A54. Three days later, on or about March 8, 2018, at CASK's
5  direction, Contractor-A-2 sent a letter to Individual-2 increasing her
6  salary to $60,500. The letter stated that the $10,500 pay raise was
7  effective as of March 1, 2018.

8       The First FRCSW 8(a) Direct Award (HHS Contract 60A)

9       A55. On or about March 20, 2018, the day after Contractor-B-
10 2 was accepted into the 8(a) program, Soriano forwarded an internal
11 Government email chain containing a PWS and IGCE from his SPAWAR email
12 account to his personal email account. Soriano then forwarded the email
13 chain and procurement documents from his personal email account to
14 Employee-1. The PWS and IGCE were from the Fleet Readiness Center
15 Southwest ("FRCSW") and pertained to a services contract with a total
16 potential value of $2,038,562.80.

17      A56. On or about March 26, 2018, Soriano followed up and asked
18 Employee-1 if Contractor-A-2 had personnel to work on the FRCSW effort.
19 Employee-1 replied, "We have already started the hiring process. Let's
20 give it to [Contractor-B-2] instead of [Contractor-A-2]." Employee-1
21 forwarded LARSEN the PWS and IGCE for the FRCSW effort.

22      A57. On or about March 27, 2018, PSC notified Soriano and
23 Parker that it could not recompete the requirements of the protested and
24 canceled Task Order 24W in the "NEW" $50 million 8(a) competitive award
25 for services requested by Parker, but it could do a new acquisition for
26 similar services as long as they were distinct from the protested
27 requirement. The next day, Parker responded, copying Soriano, "Great
28 news. I will finalize the PWS and IGCE and get them sent over."

A58. On or about April 19, 2018, Parker emailed PSC the PWS and IGCE for the FRCSW effort and requested an 8(a) direct award to Contractor-B-2. Several weeks later, Contractor-B-2 submitted to PSC its proposal to RFP #18-233-SOL-00368 for the FRCSW effort. Document properties reflect that Contractor-B-2's proposal documents were drafted by LARSEN.

A59. On or about May 19, 2018, about three weeks after LARSEN announced that he was "working [on] a $20M direct award vehicle to [Contractor-B-2]," LARSEN took Soriano and another guest to play golf at Fairmont Grand Del Mar Country Club in Del Mar, California. LARSEN paid for Soriano and the other guest's green fees, totaling $300. LARSEN also paid $392.98 at the Clubhouse Grill and $152.06 at the Member Lounge that day.

A60. On or about May 24, 2018, Soriano submitted to PSC a technical evaluation of Contractor-B-2's proposal to RFP #18-233-SOL-00368 for the FRCSW effort. Soriano was the sole evaluator and rated Contractor-B-2's overall technical capabilities and management approach "Excellent," and overall technical rating "Acceptable." As a result of Soriano's evaluation, on or about July 25, 2018, PSC awarded Contractor-B-2 8(a) Direct Award HHSP233201850060A ("HHS Contract 60A"). The award had a total potential value of $2,041,970.25. Soriano was listed as the COR on the contract.

The 20M NHO 8(a) Direct Award (HHS Contract 19I)

A61. On or about May 25, 2018, Parker sent an email to PSC requesting a "NEW" NHO 8(a) direct award contract for services to Contractor-B-2. Attached to the email was a PWS and IGCE from Army PEO AV for an approximate $20 million NHO 8(a) direct award contract for services. Document properties reflect that the PWS and IGCE attached to

1    Parker's email were drafted by Employee-2. Parker told PSC that the
2    contract needed to be awarded "quickly" and put into place "as soon as
3    possible" in order to save the Government money.

4           A62. On or about June 23, 2018, PSC issued RFP #18-233-SOL-
5    00559 to Contractor-B-2 for the "NEW" $20 million NHO 8(a) direct award
6    contract for services. The description/specifications portion of the RFP
7    was the same as the PWS that Parker emailed to PSC on May 25, 2018.
8    LARSEN forwarded the RFP to Employee-2 and CASK's Vice President,
9    stating, "We received the RFP for PEO-Aviation to [Contractor-B-2].
10   Let['s] discuss proposal response team tomorrow." No employees of
11   Contractor-B-2 were included on LARSEN's email.

12          A63. On or about June 25, 2018, Employee-2 emailed LARSEN,
13   stating, "Good news... [RFP #18-233-SOL-00559] is based off of the Cask
14   50M solicitation, so a lot of the language for this proposal response
15   is already written." Employee-2 attached to his email CASK's proposal
16   documents for the protested and canceled Task Order 24W, as well as "the
17   PWS and IGCE that [were] used to put together this solicitation."
18   Employee-2 asked, "Where did this solicitation get sent? Who is going
19   to be communicating with the Government?", and added, "**It's imperative
20   that Larsen, [CASK's Vice President], [Employee-2] and [CASK's Contract
21   Manager]....basically anyone from Cask, [Contractor-A-2], or
22   [Contractor-B-1] who has had prior dealings with HHS should NOT directly
23   communicate with HHS as a representative for [Contractor-B-2]." Later
24   that day, LARSEN replied that the solicitation was sent to the President
25   of Contractor-B-2, that individual would serve as the point of contact
26   with the Government, and because the solicitation was for an 8(a) direct
27   award, that made the award "un-protestable."
28   //

1    A64. On or about July 2, 2018, LARSEN and Employee-2 drafted
2  Contractor-B-2's proposal documents to RFP #18-233-SOL-00559. The
3  proposal was later submitted to PSC by the President of Contractor-B-2.
4  Parker subsequently submitted to PSC a technical evaluation of
5  Contractor-B-2's proposal. Parker was the sole evaluator and rated
6  Contractor-B-2's overall technical approach "Excellent" and gave
7  Contractor-B-2 an overall technical rating of "Excellent." As a result
8  of this evaluation, on or about August 20, 2018, PSC awarded Contractor-
9  B-2 NHO 8(a) Direct Award HHSP233201800019I ("HHS Contract 19I"). This
10 award had a total potential value of $19,870,000. Like HHS Contract 11I,
11 this was a three year IDIQ contract vehicle and task orders could be
12 placed against it. To conceal Soriano's involvement, Parker was listed
13 as the COR in the contract.

14    The Second FRCSW 8(a) Direct Award (HHS Contract 17C)

15    A65. On or about July 25, 2018, the same day that PSC awarded
16 HHS Contract 60A to Contractor-B-2 for the first FRCSW effort, Soriano
17 sent LARSEN a PWS and IGCE from FRCSW for a second 8(a) direct award
18 contract for services, stating, "Getting tee'd up for FY19......"

19    A66. On or about August 14, 2018, the President of Contractor-
20 B-2 emailed LARSEN a draft DD-254 for Contractor-B-2 on HHS Contract
21 60A, asking, "Can you take a look at this. ... From my understanding the
22 government is suppose[d] to give us details. If you want me to add more
23 let me know otherwise I will send as is." LARSEN revised the draft DD-
24 254, sent the revised DD-254 to the President of Contractor-B-2, and
25 replied, "Please see response."

26    Contractor-B-1 Subcontracted More Work to CASK (HHS Contract 11I)

27    A67. In or around September 2018, pursuant to a subcontract
28 agreement between CASK and Contractor-B-1 for CASK to "perform the

30

'Services' for [Contractor-B-1]" on HHS Contract 11I, Contractor-B-1 issued work orders for CASK to work on three task orders placed against HHS Contract 11I. HHS awarded these task orders, without competition, to Contractor-B-1, and their total potential value exceeded approximately $3 million. Parker approved invoices on these task orders.

### Contractor-B-2 Subcontracted Work to CASK (HHS Contract 19I)

A68. In or around September 2018, pursuant to a Master Services Agreement between CASK and Contractor-B-2 to "perform certain services for [Contractor-B-2] via individual Task Orders" on HHS Contract 19I, Contractor-B-2 subcontracted work to CASK on five task orders placed against HHS Contract 19I. HHS awarded these task orders, without competition, to Contractor-B-2, and their total potential value exceeded approximately $6.8 million. Soriano and Parker approved invoices on the task orders.

A69. On or about October 21, 2018, Soriano emailed PSC the PWS and IGCE for the second FRCSW effort and relayed that the 8(a) direct award was "[p]lanned" for Contactor-B-2.

A70. On or about December 20, 2018, Soriano submitted to PSC a technical evaluation of Contractor-B-2's proposal to RFP #19-233-SOL-00065 for the second FRCSW effort. Soriano was the sole evaluator and rated Contractor-B-2's overall technical capabilities and management approach "Excellent." As a result of this evaluation, on or about January 14, 2019, PSC issued Contractor-B-2 8(a) Direct Award HHSP233201900017C for the second FRCSW effort. This award had a total potential value of $2,046,545.99. Soriano was listed as the COR on the contract.

//

//

31

A71. In or around January 2019, Contractor-A-2 increased Individual-2's salary to $62,315. The following month, Individual-2 emailed Contractor-A-2's HR Manager complaining about the $1,815 raise. Individual-2 stated, "Received my salary adjustment and notice that what [CASK's Controller] approved as my annual salary is not the one that being approved by [Contractor-A-2]. Since Cask is paying for my salary and the approved increase is base from my performance in Cask so I don't see any reason why [Contractor-A-2] will not agree. Also, the adjustment take effect Jan 2019 so I'm expecting a back-pay as well." Individual-2's requests were forwarded to LARSEN, which he approved. Contractor-A-2, at LARSEN and CASK's direction, increased Individual-2's salary to $65,000 and paid Individual-2 back pay as well.

### CPARS Evaluation (Task Order GSQ0516BM0022)

A72. On or about February 21, 2019, in response to GSA's request to complete an interim CPARS evaluation on Task Order GSQ0516BM0022 for the 2018 year, Soriano emailed a blank version of the CPARS evaluation documents to LARSEN. LARSEN then forwarded the CPARS evaluation documents to a CASK employee.

A73. On or about March 9, 2019, Soriano followed up and emailed LARSEN completed interim CPARS evaluations on Task Order GSQ0516BM0022 for the 2016 and 2017 years which CASK helped Soriano previously draft. LARSEN replied, "Got it for action." LARSEN then re-forwarded the blank CPARS evaluation documents for the 2018 year to a CASK employee, stating, "Let me know when these will be done."

A74. On or about March 15, 2019, a CASK employee emailed Soriano a draft of the interim CPARS evaluation documents on Task Order GSQ0516BM0022 for the 2018 year. The documents rated CASK "Exceptional" in each evaluation rating area and provided favorable feedback on its

performance. Soriano took the draft and submitted the same or substantially similar ratings and feedback to GSA.

A75. On or about March 22, 2019, LARSEN took Soriano to play golf at Fairmont Grand Del Mar Country Club in Del Mar, California. LARSEN paid for Soriano's green fees, totaling $150.

The Indian Health Service Effort

A76. On or about April 3, 2019, LARSEN sent an email titled "IHS SOW" to a CASK employee, stating, "In talking with Jim Soriano at SPAWAR last week, for him to help us with the HHS vehicle, we need to get him a 'government' SOW and Cost estimate. When can I get this?"

A77. On or about April 18, 2019, LARSEN sent an email to the Vice President of Contractor-B-1 titled "[Contractor-B-1] Way Ahead." Attached was an email was a PowerPoint, drafted by LARSEN, that listed four action items. One of the action items was titled "Establish NewCo 8a... for IT integration...." The slide added, "Mark can create, like earlier businesses – please let me know how to proceed."  The slide listed an individual who could serve as the 49% owner of the new 8(a) company and stated, "Potential for other employee ownership and tracking in the future as 'ghost' equity pool out of Mark Larsen's 49%; no one else with 'seat at the table'." LARSEN later told Soriano of his interest in starting another Native Hawaiian business to do Government contracting.

A78. On or about May 2, 2019, Soriano emailed a Indian Health Service ("IHS") representative and stated that he would call the representative the next day to discuss a MIPR. The representative forwarded Soriano's email to a CASK employee, who then forwarded it to LARSEN.  Days later, LARSEN emailed Soriano and asked, "[Were] you able to talk to [the IHS representative]?" LARSEN attached to his email a

document providing instructions on how to send a MIPR. Soriano responded that he did speak with the IHS representative and would talk to the Contracting Officer. LARSEN replied, "Thank you – appreciate the help immensely."

The 22M NHO 8(a) Direct Award (NAVSEA Corona)

A79. On or about August 28, 2019, LARSEN and Soriano met to investigate alternative contracts and support agencies after PSC's shut down of assisted acquisitions. The following day, LARSEN emailed employees of Contractors-B-1 and B-2, stating, "I had a follow up meeting with Jim yesterday – we re-walked through the situation & opportunities.... He believes he can get a $22M 8(a) contract setup through Corona within 60 days from the sponsor committing the money." LARSEN suggested sending the money through Contractor-B-2 at a 90% passthrough. LARSEN was later invited to a meeting titled "Follow-on IDIQ discussion" with employees of Contractors-B-1 and B-2.

A80. On or about September 4, 2019, in response to a question from a Contractor-B-1 employee if there was anything Contractors-B-1 and B-2 could do to "assist Jim/NAVSEA at this time," LARSEN replied, "I have shared a one-pager with Jim and will follow up back up this week – we will most likely need to facilitate a govt-govt discussion."

A81. On or about September 9, 2019, Contractor-B-2's Vice President emailed Soriano, LARSEN, and the President of Contractor-B-2 about getting on a call to "line up several opportunities for a future IDIQ with NAVSEA Corona" and "establish[ing] a timeline to handle some MIPRs forthcoming in late October and early November."

A82. In or about September or October 2019, after Parker was no longer employed by NIWC, Soriano contacted Parker on behalf of LARSEN. Soriano told Parker that LARSEN wanted to use Parker to help LARSEN

34

start a new Native Hawaiian business to do Government contracting. Soriano did so with the understanding that Parker would not do substantive work and instead simply be a figurehead of the company.

A83. On or about October 23, 2019, Contractor-B-2's Vice President emailed Soriano that he had two customers due to provide MIPRs in two days. The Vice President asked whether Soriano had an update on Contractor-B-2's IDIQ contract and if NAVSEA Corona was aware that the two MIPRs would go onto the IDIQ contract. The Vice President added, "You[r] assistance in the IDIQ award and task order issuance are very much appreciated." Soriano replied, "I am on travel... [The Contracting Officer and contract specialist at NAVSEA Corona] are in SD this week. We need to sync up...."

A84. On or about January 20, 2020, after federal authorities executed a duly-authorized search warrant at CASK's east coast office, LARSEN invited a former employee to dinner. At the dinner, LARSEN brought up the investigation into CASK and admitted to the former employee, "They are accusing us of many things and we are guilty of all of it." LARSEN suggested to the former employee that he believed former CASK employees were whistleblowers who led to the search warrant being executed at CASK's east coast office in October 2019. LARSEN also suggested that there were going to be lawsuits as a result and they were going to cost people a lot of money in legal fees. Based on the conversation with LARSEN, including the language LARSEN used to describe the former CASK employees above, the former employee understood that LARSEN was referring to Employee-1 and Employee-2 as the suspected whistleblowers and that LARSEN was threatening legal action against them if he found out they were, in fact, whistleblowers that led to the search warrant. After the dinner, the former employee contacted Employee-1 and

1  Employee-2 and relayed what LARSEN had told him during the dinner. All
2  in violation of Title 18, United States Code, Section 371.

### Count 2 – Bribery (MARK LARSEN)
### (18 U.S.C. § 201(b)(1)(A) and (C))

5  38.  Paragraphs 1 through 37 of this Indictment are re-alleged and
6  incorporated herein by reference.

7  39.  Beginning in or before July 2015 and continuing through at
8  least January 2020, within the Southern District of California, and
9  elsewhere, defendant MARK LARSEN engaged in a course of conduct whereby
10  he directly and indirectly, corruptly, did give, offer, and promise
11  things of value, as a stream of benefits, to a public official,
12  personally and for other persons, including meals, rounds of golf, jobs
13  for Gutierrez and Individual-2, and pay raises to Individual-2, with the
14  intent to influence the public official in the performance of his
15  official acts and to induce the public official to do or omit to do acts
16  in violation of lawful duties, as opportunities arose; all in violation
17  of Title 18, United States Code, Section 201(b)(1)(A) and (C).

### FORFEITURE ALLEGATIONS

19  40.  The allegations set forth in Counts 1 and 2 of this Indictment
20  are incorporated by reference for the purpose of alleging forfeiture
21  to the United States pursuant to Title 18, United States Code,
22  Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

23  41.  Upon conviction of one and more of the offenses set forth
24  in Counts 1 and 2, and pursuant to Title 18, United States Code,
25  Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c),
26  defendants must forfeit to the United States any property, real and
27  personal, which constitutes and is derived from proceeds traceable to
28  the violations.

1    42.    If any of the above-described forfeiture property, as a result
2    of any act or omission of the defendants − (a) cannot be located upon
3    the exercise of due diligence; (b) has been transferred or sold to, or
4    deposited with, a third party; (c) has been placed beyond the
5    jurisdiction of the Court; (d) has been substantially diminished in
6    value; or (e) has been commingled with other property which cannot be
7    subdivided without difficulty; it is the intent of the United States,
8    pursuant to Title 18, United States Code, Section 2461(c) which
9    incorporates the provisions of Title 21, United States Code,
10    Section 853(p), to seek forfeiture of any other property of the
11    defendants up to the value of the property described above as being
12    subject to forfeiture.
13    All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and
14    Title 28, United States Code, Section 2461(c).
15        DATED:    October 8, 2024.

16                                          A TRUE BILL:

19    TARA K. McGRATH
      United States Attorney
20
21    By:
22        PATRICK C. SWAN
          KATHERINE E.A. MCGRATH
23        Assistant U.S. Attorneys